WOLFF et al. v. E. I. DU PONT DE NEMOURS & CO.

(Circuit Court, D. Delaware. May 29, 1903.)

1. PATENTS—VALIDITY AND INFRINGEMENT—PROCESS FOR MAKING SMOKELESS POWDER.

The Von Freeden patent, No. 429,516, for a process for making smokeless gunpowder from nitro-cellulose, by first completely dissolving the same by a solvent, and, after it is kneaded or rolled into a plastic mass, adding a "liquid or vapor chemically indifferent to the constituents of the mass," preferably water or steam, and stirring until complete granulation has been produced, if not invalid for insufficiency of description, in not specifying the quantity of water or steam required or used to produce granulation, is not infringed by the process of the Du Pont patent, No. 503,586, in which finely divided nitro-cellulose is distributed uniformly, by means of stirring, throughout a body of water or liquid, which holds it in suspension, to which the solvent is then added and the stirring continued, by which means gelatinization and granulation are simultaneously effected; the process being essentially different, and the product in one case being a completely gelatinized grain, while in the other it is only partially gelatinized. Claim 2, which covers the heating of the grains formed by the process of claim 1 in hot water or by steam, for the purpose of evaporating the volatile solvent therein, is void for lack of patentable invention; such process being old in the arts, and also shown in prior patents relating to the same art.

In Equity. Suit for infringement of letters patent No. 429,516, for a process for making smokeless gunpowder, granted to Richard Von Freeden June 3, 1890. On final hearing.

Julian C. Dowell, for complainants.

Frederic P. Fish and Charles Neave, for defendant.

GRAY, Circuit Judge. This is a bill in equity filed by the complainants, as owners by assignment of the letters patent No. 429,516, issued June 3, 1890, to Richard Von Freeden, against the defendant, claiming infringement of the said letters patent, seeking to restrain the same, and praying for an account of profits, etc.

The answer of the defendant admits the issuance of the letters patent to Von Freeden, as stated, and the ownership of the same by complainants, but claims that the same are invalid, by reason of prior use, anticipation, nonpatentability, and insufficiency of description, and denies infringement. The subject-matter of the patent in suit, and the art to which it relates, are described in the specifications and claims of the letters patent, as follows:

"To All Whom It may Concern:

"Be it known that I, Richard Von Freeden, a subject of the Grand Duke of Oldenburg, residing at Walsrode, kingdom of Prussia, Germany, have invented a new and useful improvement in the manufacture of gunpowder from nitro-cellulose, whereof the following is a specification:

"My invention is based on the discovery made by me that gelatinized nitro-cellulose still containing the solvent employed for its gelatinization on being exposed to certain liquids or to vapors thereof undergoes a kind of coagulation and a division into small lumps, which latter is promoted by stirring. This peculiar behavior of the gelatinized nitro-cellulose I make use of in the manufacture of granulated gunpowder from nitro-cellulose or compounds thereof with other substances. In view of producing such gunpowder, which is not affected by moisture, the nitro-cellulose, whether pure or mixed with

other materials, is at present either converted in its original state into particles, which are thereupon gelatinized on the surface, or it is at the onset thoroughly gelatinized, and subsequently divided by mechanical means into small pieces or laminæ.  In the first case the powder is not sufficiently resistant against the influence of damp air, while in the second case it is impossible to obtain grains of like size and form, which is so much the more prejudicial, as this nonuniformity is an obstacle to the complete expulsion of the solvents employed in the gelatinizing process, in consequence whereof a difference in the chemical constitution and explosive power of the grains results.  For the purpose of obviating these defects I proceed as follows:

"The nitro-cellulose, or compound thereof with other substances, is first mixed with a liquid adapted to dissolve the former—such as ethyl-ether, methyl-ether, a solution of camphor in ether, a mixture of ether and alcohol, dinitro-toluol, etc.—and the mixture is kneaded or rolled until it has become plastic and the nitro-cellulose completely dissolved.  To the mass thus obtained I introduce a liquid or vapor incapable of dissolving or otherwise acting chemically either on the nitro-cellulose or on the ingredients of the said compound thereof.  Preferably I employ water or steam, or both together.  At the same time the mass is stirred.  By these means the mass is caused to split up into particles or grains, which become smaller in the measure as the stirring is continued and the temperature is raised.  The grains are heated together with the same or any other like liquid, vapor, or steam unadapted to act chemically thereon, the temperature being carried to a degree somewhat above the boiling point of the solvent employed in order to completely drive out the latter.  The said solvents are thereby extracted from the grains and evaporated; but they may be recovered by distillation.  Thereupon the grains are separated from the liquid or withdrawn from the steam or vapor and dried, and finally they are treated in the ordinary manner in view of producing finished gun or blasting powder.

"The described method of extracting the solvents may also be applied to grains composed of or containing gelatinized nitro-cellulose, which are produced by means different from those specified.

"I claim as my invention:

"(1) The process of gelatinizing and granulating nitro-cellulose or a compound thereof with other substances, which consists in adding to the said nitro-cellulose or compound a solvent of the former, kneading the mass until the same has become plastic and the nitro-cellulose thoroughly gelatinized, introducing thereto a liquid or vapor chemically indifferent to the constituents of the mass, and stirring the latter until complete granulation has been produced, substantially as described.

"(2) The process of treating grains composed of gelatinized nitro-cellulose or of a compound thereof with other substances and still containing the solvent employed for the purpose of gelatinization, the said process consisting in exposing the grains to a heated liquid or vapor chemically indifferent to the solid constituents thereof and afterward drying the grains, substantially as described.

"In testimony whereof I have hereunto set my hand in the presence of two subscribing witnesses.                    Richard Von Freeden.

"Witnesses:
    "W. H. Edwards.
    "W. Haupt."

The nitro-cellulose here referred to, is an explosive nitrate of cellulose, commonly known as "gun cotton."  It is made by digesting clean cotton in a mixture of nitric and sulphuric acid.  There are other nitrates of cellulose made with weak acids and a short period of digestion, which are not gun cotton, or the particular nitrate with which we are here concerned.  This nitro-cellulose, or gun cotton, is soluble in certain liquids, as stated in the specifications of the patent, such as ethyl-ether, methyl-ether, a solution of camphor in ether, etc. When one of these solvents is mixed in proper proportion with wet

gun cotton, and the mixture kneaded or rolled for a sufficient length of time, the cellulose fibre is wholly dissolved, and a homogeneous gelatinous mass is produced. The production of such a gelatinous mass, by the admixture and kneading of the solvent with the gun cotton, was well known in the art at the date of the patent, and forms the raw material, so to speak, of the process of the patent. Indeed, the Pfleiderer kneading machine, used by the complainants for working together the solvent and the gun cotton into a gelatinous mass, was one already devised by the person whose name it bears, and probably superseded some other mode of kneading in use prior to the patent in suit. It is only important to bear in mind, that a "gelatinous and plastic" mass, produced by this or a similar kneading or rolling process, in which the nitro-cellulose has become "completely dissolved," is the absolutely necessary starting point for the process described in the specifications and first claim of the patent in suit.

Starting, then, with this plastic mass, so produced and described, "my invention," says the patentee, "is based on the discovery made by me that gelatinized nitro-cellulose still containing the solvent employed for its gelatinization on being exposed to certain liquids or to vapors thereof undergoes a kind of coagulation and a division into small lumps, which latter is promoted by stirring." The invention or discovery of the patent is clearly stated to be the division of this gelatinized mass into lumps, by the exposure thereof to certain liquids or vapors chemically indifferent thereto, and that this result is promoted by stirring. It is a process of granulation, and involves the formation of a plastic mass, by kneading a mixture of nitro-cellulose and its solvent, so that the nitro-cellulose is "completely dissolved." The method of forming this plastic mass is precisely what it was in the art prior to the patent. It is accomplished without the use of water, and constitutes the first step of the process.

The specification of the patent says:

"To the mass thus obtained I introduce a liquid or vapor incapable of dissolving or otherwise acting chemically either on the nitro-cellulose or on the ingredients of the said compound thereof. Preferably I employ water or steam, or both together. At the same time the mass is stirred."

This is the second step in the process; and that there is here described whatever there is of invention, as covered by the first claim of the patent, is apparent from the language of the specification which immediately follows:

"By these means [that is, by the introduction of the water or steam, and the stirring] the mass is caused to split up into particles or grains, which become smaller in the measure as the stirring is continued and the temperature is raised."

The process, therefore, is one of granulation of a previously formed gelatinized and plastic mass, in which the gun cotton has been completely dissolved, and which still contains the solvent.

The description of the process in the specifications would seem to assume that the water or steam is introduced to the plastic mass in the same vessel in which it was being kneaded for the purpose of gelatinization, and that the stirring required after the introduction of the

water or steam, is a continuation of the same kneading process in the same vessel and by the same kneading blades or paddles. It is this process of granulation which the patentee describes as his contribution to the art. Prior thereto, the state of the art is thus described in the letters patent:

"In view of producing such gunpowder, which is not affected by moisture, the nitro-cellulose, whether pure or mixed with other materials, is at present either converted in its original state into particles which are thereupon gelatinized on the surface, or it is at the onset thoroughly gelatinized and subsequently divided by mechanical means into small pieces or laminæ."

Neither of these methods, says the patentee, were entirely satisfactory, as, in the first case, the powder was not sufficiently resistant to moisture, and in the second, it was impossible to obtain grains of like size and form. The method in the prior art nearest to that in the patent in suit, was the last described. It could have been practiced by gelatinizing, as already described, pulped wet gun cotton, by mixing it with a solvent and thoroughly kneading it in one of the Pfleiderer kneading machines, used in forming the gelatinized plastic mass of the patent in suit. Up to this point the processes are the same. The old method, however, was to take this gelatinized plastic mass, and, having rolled it into thin sheets, mechanically cut it into small flakes or pieces. Von Freeden takes the same mass and introduces thereto water or steam, the mass still being stirred or kneaded, and says that he finds that it will break up into grains. That is, Von Freeden broke up or granulated his gelatinized mass (presumably) in the kneading machine, by introducing thereto water or vapor, while it was still being kneaded or stirred, instead of mechanically cutting the same into flake-like grains, when rolled into sheets. Von Freeden claims to have devised a new means, to take the place of the old mechanical means, of dividing into grains the mass of completely dissolved nitro-cellulose. This is the process described in the first claim, which we again quote:

"I claim as my invention:
"(1) The process of gelatinizing and granulating nitro-cellulose or a compound thereof with other substances, which consists in adding to the said nitro-cellulose or compound a solvent of the former, kneading the mass until the same has become plastic and the nitro-cellulose thoroughly gelatinized, introducing thereto a liquid or vapor chemically indifferent to the constituents of the mass, and stirring the latter until complete granulation has been produced, substantially as described."

The second claim of the patent refers to the mode of treating the grains after they are formed, by heat, so as to drive off the solvent, before drying the grains and sorting them for use. This claim will be considered separately.

The defendant's process is alleged to infringe that of the complainants, as covered by the first claim of the patent in suit, and the specifications relating thereto, and we must now examine it in the light of the testimony and exhibits in the case.

Mr. Francis G. Du Pont, then vice president of the defendant company, who was called as a witness by the complainants at the beginning of the taking of testimony, described the process by which the defendant carried on the manufacture of smokeless powder prior to the filing

of the bill of complaint, and subsequent to the grant of the patent in suit to Von Freeden, June 3, 1890. His description is substantially as follows:

"In carrying on the process there is used a stationary vertical cylindrically formed still of substantially the form and construction of the still marked 'A' in the drawings attached to letters patent No. 503,586 granted to Francis G. Du Pont on August 22, 1893. Around the outside of the lower portion of the still is a jacket in which steam may be caused to circulate when it is desired to heat the contents of the still. A rotatable shaft [not shown in the drawing] extends downward through a stuffing box in the top of the still to a point near its bottom and carries six arms extending across it, each arm attached at its central point to the shaft and at points on the shaft about eight inches apart, and the ends of the arms reach nearly to the wall of the still."

### Drawing Accompanying Du Pont Patent No. 503,586.

A large quantity of water, stated by Mr. Francis I. Du Pont (son of Francis G. Du Pont), on a rough estimate, to amount to about 2½ to 3 tons, in which about 5 per cent. of barium nitrate and 2 per cent. of saltpeter have been dissolved, is then pumped into the still, only partially filling the same. At the time of the introduction of the water, the horizontal stirrers are set in rotation and continued so during the whole of the process. Finely pulped wet gun cotton, sometimes amounting, according to Mr. F. I. Du Pont, to as much as 450 or 500 pounds, and which has not as yet been subjected to the action of any solvent, is then thrown into the still through an opening in its upper part, and by the action of the stirrer blades then going on, is immediately mixed through the water in the still, forming a whitish liquid of about the consistency of milk. "More water, in which barium nitrate and saltpeter have been dissolved, is then pumped into the still, until the surface of the liquid in the still is about on a level with the upper stirrer blades on the vertical shaft." The stirrer blades are rotated at a speed sufficient to maintain the particles of gun cotton in mechanical suspension in the water. An emulsion, formed by beating up amyl acetate, which is a solvent of nitro-cellulose, in water in which barium nitrate and saltpeter have been dissolved, is then pumped into the still. The volatile, oily particles or globules of the solvent at once seize upon the finely divided particles of nitro-cellulose suspended in the liquid in the still, the constant stirring serving to distribute the particles of emulsion thoroughly throughout the liquid and to bring them into contact with the fine particles of nitro-cellulose, partially gelatinizing and granulating the same. This gelatinization and granulation is practically instantaneous, as both are simultaneously effected within 5 minutes after the introduction of the emulsion into the still is begun, and it is in testimony that it takes several minutes for the whole emulsion to be run into the still (whereas, according to the testimony of Mr. Hesse, managing agent of complainants, and produced as a witness by them, the kneading of the mixture of gun cotton and its solvent into a gelatinous and plastic mass takes 30 minutes, and the disintegration of the same into grains, before the evaporation of the solvent begins, takes 15 minutes more).

The description so far relates to the granulation of the materials introduced into the still, to wit, the finely divided, pulpy nitro-cellulose, held in suspension throughout the liquid in the still, and the solvent emulsion afterwards introduced; and, as already observed, such granulation is practically instantaneous upon the meeting of the globules of the emulsion and the fine particles of nitro-cellulose, held in suspension throughout the liquid. The process up to this point is clearly not, as in that of Von Freeden, the disintegration and breaking up of a previously formed gelatinized mass of nitro-cellulose, in which the fiber has been thoroughly dissolved (the said breaking up of the mass, presumably, from the specifications and claims of the patent, taking place in the kneading machine while being kneaded and torn by the blades of the machine, and softened by exposure to water or steam), but is a building up of grains by the meeting and union of small particles of the finely divided nitro-cellulose, as suspended in the liquid in the still, with the small globules or particles of the solvent; these con-

tacts being insured by the constant stirring of the liquid holding such particles in suspension. It is true, that the materials of the two processes are the same, to wit, nitro-cellulose, a solvent, and water, but the mode, as well as the order in which they are used and act upon each other, is different. In the "Du Pont" process, there is no previous kneading together of the pulped nitro-cellulose with a solvent, until a thoroughly gelatinized mass of measurable consistency and toughness is formed, and no gelatinized mass at all. In fact, there is no kneading of a mass, or anything that could be called its equivalent, in the "Du Pont" process, and consequently, there is no exposure of such a mass to water or steam, and its consequent disintegration, produced, so far as we may conjecture, by the softening effect of the water upon the mass, promoted by the tearing action of the rotating kneading blades, and by the possible mechanical effect of the agitated water, if a sufficient quantity thereof is introduced.

It may as well be here observed, however, that there is no statement anywhere in the specifications or claims of the patent in suit, as to how much water is to be used in this disintegrating process, or as to the manner in which it is to be applied. The specifications begin by saying:

"My invention is based on the discovery made by me that gelatinized nitro-cellulose still containing the solvent employed for its gelatinization on being exposed to certain liquids or to vapors thereof undergoes a kind of coagulation and a division into small lumps, which latter is promoted by stirring."

Again, at line 41 et seq., the following language is used:

"The nitro-cellulose, or compound with other substances, is first mixed with a liquid adapted to dissolve the former, * * * and the mixture is kneaded or rolled until it has become plastic and the nitro-cellulose completely dissolved. To the mass thus obtained I introduce a liquid or vapor incapable of dissolving or otherwise acting chemically either on the nitro-cellulose or on the ingredients of the said compound thereof. Preferably I employ water or steam, or both together. At the same time the mass is stirred. By these means the mass is caused to split up into particles or grains."

The first claim also speaks of "kneading the mass until the same has become plastic and the nitro-cellulose thoroughly gelatinized, introducing thereto a liquid or vapor chemically indifferent to the constituents of the mass, and stirring the latter until complete granulation has been produced substantially as described." So far as any explanation of the process is contained in the specifications or claims, it does not appear whether water is to be introduced in such quantity as that it shall hold the mass in suspension. It speaks of introducing "to the mass thus obtained" water or steam, or both together. This description might well suggest a softening of the mass by a spray of water, the mass being stirred the while by the kneading blades, the softening by the vapor or spray resulting in a breaking up of the mass into smaller and smaller particles. So, too, the introduction of steam "to the mass thus obtained" would suggest that the mass itself was being torn by the blades of the kneading machine, while subjected to the softening effect of the steam. I can find no suggestion in the specifications or claims of the patent, that it is necessary that the mass should be placed in a large quantity of water, which would hold in suspension such mass and the granulations thereof, as they were being

formed, whether by the stirring of the blades or the agitation and softening effect of the water, or by both. And especially is the suggestion of such a condition excluded by the consideration that the introduction of steam to the gelatinized mass is the alternative of the introduction of water to the same. The only concept possible as to the use of steam, as described in the patent in suit, is that of a moistening of the mass, and a consequent softening thereof from the moisture produced by the continued application of the vapor, analogous to the effect produced by spraying water upon the gelatinized mass, which is meanwhile being stirred and torn with the blades, thus working the water into the mass or dough, and making it more and more soft. Whether such an application of steam or moistening by water, as would be suggested by the language of the specifications and claims, would be sufficient to produce the granulation required, or not, it seems to have been assumed in the testimony that a quantity of water, large enough to hold in suspension the gelatinized mass and the granulations thereof, was in fact introduced into the containing vessel or kneading machine, and the stirring or kneading process of the mass was continued in that body of water until sufficient disintegration and granulation took place. I am inclined to think, however, that if such "exposures" to water or steam, as seem to be warranted by the language of the specifications and claims, would not produce the effect desired (and the testimony of Mr. Little is that they would not, and Prof. Munroe confirms this, as to the use of steam), then the directions and explanations of the specifications and claims would not sufficiently inform one skilled in the art, to successfully practice the process intended to be set forth in the patent, so as to conform to the requirement of section 4888 of the United States Revised Statutes [U. S. Comp. St. 1901, p. 3383]. However this may be, the patentee of the patent in suit must be held to his invention as he has described it. His claim cannot be enlarged beyond the fair meaning of the language employed to set it forth. The first claim of the patent, taken in connection with the specifications to which it refers, absolutely requires as a necessary condition to the process, that a mixture of nitro-cellulose, or a compound thereof with other substances, with a solvent of nitro-cellulose, be kneaded or rolled until it has become plastic and the nitro-cellulose completely dissolved. The language of the claim and specifications make the formation of such a thoroughly gelatinized mass, in which the nitro-cellulose has been "completely dissolved," the indispensable and essential first step of the patented process. It is the introduction of water or steam to such a mass (and no other) and the stirring thereof, that produces the breaking up and granulation of said mass, as alleged in the patent. Nothing can be clearer than this essential requirement of the patent in suit. The ingredients were, of course, old. Nitro-cellulose, gelatinized by a solvent into a plastic mass, had, before the date of the patent, been rolled into sheets and mechanically divided into grains. This belongs to the prior art, as stated in his specifications by the patentee himself, and the invention claimed by the patentee, and the only one that can be claimed, is the breaking up of this same thoroughly gelatinized plastic mass, by exposing it to water or steam, and stirring it meanwhile.

Prof. Munroe, the complainants' principal witness, clearly misconceives the scope of the invention, as set forth in the specifications and claims of the patent, for he says in his examination in chief, when contrasting the process of the patent in suit with that of Du Pont:

"Whereas Von Freeden preferably gelatinizes his gun cotton before introducing it into the chemically indifferent liquid which is being stirred," etc.

As we have just shown, the patentee presents to those who would practice his process, no choice between his first step of forming a thoroughly gelatinized and plastic mass before introducing it to the water, and the method adopted by Du Pont, of dispensing with such a gelatinized mass and dropping the ingredients of which it is composed, separately and directly into the water in the still. As has been shown, the formation of a thoroughly gelatinized and plastic mass, by the kneading or rolling of a mixture of nitro-cellulose and a solvent, is the essential first step of the process of the patent in suit, and its claims cannot be enlarged by construction to cover what is not described therein. Such an enlargement of the claim would be an unjustifiable obstruction to the advancement of the art here in question.

The patent in suit is not a primary one, and, assuming its validity, can claim none of the privileges of construction accorded to such patents. The multiform uses of water in the arts cannot be restricted by this patentee, except when employed for precisely the same function on the same material, as described and claimed in the patent in suit. As has been already pointed out, in the "Du Pont" process, there is no gelatinized plastic mass, made by mixing and kneading nitro-cellulose and a solvent thereof, until the nitro-cellulose has been "completely dissolved," to be disintegrated and broken up into grains by being stirred in water. In that process, the nitro-cellulose, finely powdered, is dropped into a large quantity of water in a state of agitation from mechanical stirring, so that it at once assumes the appearance and consistency of milk. Into this milky fluid, is introduced, from a separate vessel, an emulsion of a solvent of nitro-cellulose, and, as has already been described, grains are built up by the contacts of the fine particles of nitro-cellulose with the small particles or globules of the solvent, the agitation of the water serving to distribute throughout the liquid the particles of each ingredient. No gelatinized mass is pulled down into grains, but grains are built up, by the instantaneous, though partial, gelatinization of the finely divided nitro-cellulose, from contact with the small particles or globules of the solvent distributed in emulsion throughout the liquid. The function of the water in the "Du Pont" process is thus seen to be entirely different from its function in the process of the patent in suit. There, in some mode not clearly explained, the introduction of water to the previously formed plastic mass of gelatinized nitro-cellulose, serves, with stirring of the same, to disintegrate the mass into smaller and smaller pieces and grains. Just how this is done, the patent, as we have already said, does not explain. The patentee in the specifications speaks of it as "the peculiar behavior of gelatinized nitro-cellulose" when exposed to liquids or vapors thereof. In the "Du Pont" process, on the other hand, the function of the large quantity of water in the still is not to disintegrate a gelatinized and plastic mass of nitro-

cellulose, but to hold in suspension the finely divided and undissolved nitro-cellulose while the solvent emulsion is introduced, which immediately gelatinizes these fine particles into grains, the water meanwhile performing the further function, when stirred, of bringing the solvent and the particles of cellulose into contact, and also preventing the agglutinization of gelatinized grains into larger ones.

The function of the stirring is also different in the two processes. In that of Von Freeden, it is to "promote" the granulation of the previously formed gelatinized and plastic mass, by the division of the same into small lumps. Prof. Munroe says that the tumult of the stirred water—the reflex waves from the side of the receptacle—mechanically aids this division of the mass. In the "Du Pont" process, the function of the stirring is first to prevent the lighter and oily solvent in the emulsion from collecting at the top of the liquid in the still, and its heavier ingredients at the bottom; and second to distribute the finely powdered nitro-cellulose uniformly throughout the liquid in which it is suspended, and thereby insure contacts between the small particles of the same with the globules of the solvent, from which gelatinization and granulation simultaneously ensue. This new function of the water, in the manufacture of smokeless powder from nitrocellulose, seems to us an important one, and one never theretofore availed of until shown by the "Du Pont" process. It was a further step in advance in the art of the manufacture of smokeless powder, and on lines entirely new and distinct from those laid down in the patent in suit. It dispenses entirely with the first step of the "Von Freeden" process—the formation of a gelatinized plastic mass, in which nitrocellulose has been completely dissolved, to be thereafter disintegrated into grains—for in the process of defendant, gelatinization and granulation are produced simultaneously. This is admitted by Prof. Munroe, the complainants' expert. It is an instantaneous formation of a partially gelatinized grain—a new product as well as a new process, as will be explained hereafter.

Having pointed out what seem the essential characteristics of the two processes, that of the patent in suit and that of the alleged infringement of Du Pont, and the difference between the two, so far as the "Von Freeden" process is covered by the first claim of the patent in suit, it remains to consider that part of the process covered by the second claim thereof.

It will be remembered that, in the specifications of the patent in suit, after describing the stirring of the plastic mass of gelatinized nitro-cellulose after water was introduced to the same, and the granulation thereupon ensuing, it is said that the temperature is raised and that:

"The grains are heated together with the same or any other like liquid, vapor or steam unadapted to act chemically thereon, the temperature being carried to a degree somewhat above the boiling point of the solvent employed, in order to completely drive out the latter. The solvents are thereby extracted from the grains and evaporated, but they may be recovered by distillation. Thereupon, the grains are separated from the liquid or withdrawn from the steam or vapor and dried."

They are then ready to be treated in the ordinary manner for producing finished gun or blasting powder. That is to say, after the

granulation of the gelatinized mass, in which the nitro-cellulose has been "completely dissolved," it is necessary to remove the solvent, in order that the grains may be hardened so as to form a freely flowing powder for use in small arms, and wherever the old black powder had formerly been used. The second claim of this part of the process, is as follows:

"(2) The process of treating grains composed of gelatinized nitro-cellulose or of a compound thereof with other substances and still containing the solvent employed for the purpose of gelatinization, the said process consisting in exposing the grains to a heated liquid or vapor chemically indifferent to the solid constituents thereof and afterward drying the grains substantially as described."

The obvious effect of heat, whether applied to a volatile substance more directly, or through the medium of heated or boiling water or steam, to promote the volatilization and evaporation thereof, is part of the common knowledge of the practical arts, and has been time out of mind. Unless the function of boiling water or of steam injected through the substance to be evaporated, and the liquid containing the same, be such a novel application and use of heat for the purposes described, as not readily to occur to one ordinarily skilled in the art, it should not receive the protection of a patent. A careful considera- tion of the specifications and second claim of the patent, and the testi- mony relating thereto, convinces me that the mode of driving out the solvent by evaporation, described in the patent, does not disclose such novelty of function in the application of steam or hot water for that purpose as is required by the patent law. It is not surprising, there- fore, to find from the testimony that the evaporation of the solvent from nitro-cellulose grains, was practiced in the manufacture of smoke- less powder prior to the date of the patent in suit. The references made by the defendant to the patent of Reed and Johnson, of 1882, the Johnson patent of 1888, and that of Abel of 1890, set out in the record, support this assertion.

But apart from the want of novelty, as shown by anticipation, I am of opinion that the process of evaporating the solvent, as described in the patent in suit, did not require the exercise of the inventive faculty to evolve it. The process consists in heating the grains in water, or by steam, the known effect of which heating, was the volatilization and evaporation of the volatile solvent. The water or vapor is a con- venient and good medium for transmitting the heat uniformly to all the grains. The necessity of getting rid of the solvent, in order that it might not injuriously affect the explosive qualities of the powder, was well understood, and after his granulating process was finished, this necessity still remained, and the patentee had only to resort to the well-known function of heat in evaporating the solvent, by heating above the boiling point the water in which the grains were suspended.

The record discloses patents for the manufacture of other articles than gunpowder, in which a volatile solvent is removed from the ma- terial which it has dissolved, by the use of heated water. The patents granted to Marquard, Nos. 51,331 and 51,332, referred to in the rec- ord, illustrate this process. The same method of removing a solvent is also shown in the Clark patent of 1882, also cited in the record. It

is hardly necessary to refer to other instances cited by defendant and set forth in the record.

Although the general views so far expressed, as to both claims of the patent in suit, and the alleged infringing process of the defendant, are sufficient to dispose of the case, it is proper to advert to certain special features of both processes, which were forcefully and ably discussed by counsel on both sides. The testimony of the experts produced for the complainants and defendant respectively, has been carefully considered. Prof. Munroe, while contending in behalf of complainants, that the defendant's process is substantially that of the patent in suit, and infringes the same, says, in the course of his testimony more than once, that in the "Du Pont" process, the granulation and gelatinization of the nitro-cellulose occur simultaneously. In the course of the same cross-examination, he distinctly says that, in the "Du Pont" process, the nitro-cellulose is gelatinized in grains, and that in that process, there is no kneading of a nitro-cellulose with its solvent into a plastic mass. On cross-examination, the following question was asked:

"XQ. 205. In practicing the defendant's process, is there produced any gelatinized plastic mass, which after being produced is divided up into grains by stirring?
"A. That I cannot say. I believe that there are plastic masses produced in the operation which are not subsequently divided up into grains by stirring, but that there is any part of the mass produced in the plastic condition which is subsequently divided up into grains by stirring, I do not know, though I can conceive of its being possible."

But Prof. Munroe, in his examination in chief (complainants' record, page 204), said:

"Both the Du Pont and Von Freeden processes are processes in which fibrous nitro-cellulose, subdivided into fine parts, is built up into plastic masses by means of a gelatinizing agent, and in which they are subdivided into small lumps by means of a chemically indifferent liquid or vapor, preferably water or steam, or both together."

Further on, in the same answer, he said:

"Both Von Freeden and Du Pont stir the gelatinized mass in a chemically indifferent liquid. Von Freeden stirs in a kneading machine in a small volume of water; Du Pont stirs in his 'still' in a very much larger volume of water, in which the plastic mass is freely suspended."

Upon this testimony, apparently, is founded the contention of the complainants, set forth as a capital proposition on page 46 of the brief, as follows:

"In the 'Du Pont' process, as practiced by the defendant, there is formed a plastic mass, which is kneaded in the sense in which Von Freeden uses these terms, and as they are understood by persons skilled in the art to which the invention relates."

If this is the contention of the complainants, in regard to the defendant's process (and it would seem necessary to their case that it should be), it is incumbent upon complainants to prove it, for this is the essential feature of the process of the patent in suit, that must be found in defendant's process, in order to maintain the charge of infringement. The burden is on the complainants to show this alleged condition as an existing fact, not that it is merely possible or probable.

This, however, complainants have failed to do. Prof. Munroe, when particularly interrogated on the precise point, as in cross-question 205, above quoted, fails to support the general and loose expressions of his examination in chief. He simply says:

"I cannot say that, in practicing the defendant's process, there is produced any gelatinized plastic mass, which after being produced is divided up into grains by stirring."

On the other hand, Mr. Little, a chemist of 25 years' standing, and who for 15 years or more has been specially employed in the study of cellulose, its properties and compounds, says, when speaking of the "Du Pont" process:

"Du Pont mixes an emulsion of a solvent of nitro-cellulose, not with nitro-cellulose itself, but with a thin mixture of finely divided fibrous nitro-cellulose in water. In thus mixing the two, there is no suggestion of what Von Freeden styles 'kneading' or 'rolling,' any more than stirring a little flour and water together into a thin pulp or liquid is 'kneading' dough. There is no production of a plastic mass, but instead. a body of liquid containing the nitro-cellulose distributed uniformly through it in the form of flocks, or, in other words, the nitro-cellulose is in the floculent as opposed to the plastic condition. When the nitro-cellulose reaches this condition in the 'Du Pont' process, it has been granulated and it is stirred to maintain it in the granular condition," and to insure contacts between these grains of nitro-cellulose and the oily globules of the solvent, by which the instantaneous formation of partially gelatinized grains is brought about, and the stirring is continued to prevent the agglutinization of these gelatinized grains, before they are hardened.

In the endeavor to show substantial identity between complainants' and defendant's processes, there is, both in the general statements of complainants' expert witness and in the argument of the complainants' brief, a failure to keep in view the essential feature of the patent in suit, to wit, the prior formation of a gelatinized plastic mass by kneading or rolling, to which water is afterwards introduced. Prof. Munroe, in his testimony in chief, as quoted above, says:

"Von Freeden stirs in a kneading machine in a small volume of water; Du Pont stirs in his still in a very much larger volume of water, in which the plastic mass is freely suspended."

And immediately adds:

"Both heat the plastic mass with stirring in the chemically indifferent liquid, by which the particles or grains are hardened throughout their mass."

This is a confusion of the two steps in the process: (1) The formation of the grains, and (2) the removal of the solvent by evaporation, and the consequent hardening effect of the heated water after the grains are formed. The vital distinction between the two processes in forming the grains thus to be hardened, is overlooked, and the existence of a "plastic mass * * * freely suspended" in water in the "Du Pont" process is assumed.

These admissions and answers, by the complainants' own expert, touch the crucial point of the controversy, as to the two processes of complainants and defendant respectively. They not only fail to support the contention of complainants, that the essential feature of complainants' process, to wit, the disintegration and granulation of a previously formed gelatinized and plastic mass of nitro-cellulose, in which the nitro-cellulose has been completely dissolved by the gelatinizing agent, by exposing the same to or introducing thereto a chem-

ically indifferent liquid or vapor thereof, is found in defendant's process, but affirmatively support defendant's contention as to the difference between the two processes.

Attention has already been called, in the course of this opinion, to the failure of the specifications and claims of the patent in suit to set forth the requirements of the process, as to the manner in which water is to be applied or "introduced to" the previously formed gelatinized and plastic mass of nitro-cellulose "in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound and use the same." It will not answer the requirements of the statute to leave the ascertainment of the precise manner in which this essential step of the process is to be practiced, to experimentation; but it would seem that this is just what is done by the inadequacy of the terms used in the patent, in describing the essential feature of the process. The language of the specifications already quoted is:

"To the mass thus obtained I introduce a liquid or vapor. * * * Preferably I employ water or steam or both together. At the same time the mass is stirred."

Certainly one attempting to follow this direction, would not be informed by the language quoted, as to whether water was to be introduced into the kneading machine in such quantities as to hold the mass in suspension, or only in the form of a spray, or otherwise in such small quantity as would suffice to moisten and soften the somewhat tough and gelatinized nitro-cellulose. The latter would seem the more plausible suggestion, since, in the first clause quoted, the alternative of liquid is "a vapor thereof," and in the latter, the alternative of water is steam. Here we have both "vapor" and "steam" recommended as granulating agents, in lieu of water or other liquids. One attempting to make gunpowder by the process of the patent in suit, is assured by the patentee that either of these agents will produce the result desired, namely, the granulation of the gelatinized plastic mass. It is only by experiment, however, that the process as practiced commercially, could be arived at. Prof. Munroe, complainants' expert, says, in answer to cross-question 163:

"I have taken it for granted that when steam was used there was a fluid present in the liquid state which would be produced by the condensation of steam at least sufficient in order to get that freedom of motion of the particles necessary to segregate portions into grains. I should at least in practice expect to use the steam so as to produce this effect, and therefore I do not consider the conditions set forth in this interrogatory where a fluid in the state of vapor or gas alone is present would occur in practice, and I should not expect to granulate with dry steam out of the presence of a liquid."

Here, then, we have the testimony of complainants' own witness, that the use of steam or vapor, as directed or suggested by the patent in suit, would result in failure, evidencing in this respect noncompliance with the requirement of the patent law above quoted. We also conclude that the same would be the result from the use of any other vapor. The language of the Supreme Court, speaking through Mr. Justice Brown, in the case of the Incandescent Lamp Patent, 159 U. S. 474, 16 Sup. Ct. 75, 40 L. Ed. 221, seems entirely pertinent:

"It is required by Rev. St. § 4888 [U. S. Comp. St. 1901, p. 3383], that the application shall contain a written description of the device 'and of the manner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person, skilled in the art or science to which it appertains or with which it is most nearly connected, to make, construct, compound, and use the same.' The object of this is to apprise the public of what the patentee claims as his own, the courts of what they are called upon to construe, and competing manufacturers and dealers of exactly what they are bound to avoid. Grant v. Raymond, 6 Pet. 218, 247 [8 L. Ed. 376]. If the description be so vague and uncertain that no one can tell except by independent experiments, how to construct the patented device, the patent is void.

"It was said by Mr. Chief Justice Taney in Wood v. Underhill, 5 How. 1, 5 [12 L. Ed. 23], with respect to a patented compound for the purpose of making brick or tile, which did not give the relative proportions of the different ingredients: 'But when the specification of a new composition of matter gives only the names of the substances which are to be mixed together, without stating any relative proportion, undoubtedly it would be the duty of the court to declare the patent void. And the same rule would prevail where it was apparent that the proportions were stated ambiguously and vaguely. For in such cases it would be evident, on the face of the specification, that no one could use the invention without first ascertaining, by experiment, the exact proportion of the different ingredients required to produce the result intended to be obtained. * * * And if, from the nature and character of the ingredients to be used, they are not susceptible of such exact description, the inventor is not entitled to a patent.'

"So in Tyler v. Boston, 7 Wall. 327, 330 [19 L. Ed. 93], wherein the plaintiff professed to have discovered a combination of fusel oil with the mineral and earthy oils, constituting a burning fluid, the patentee stated that the exact quantity of fusel oil, which is necessary to produce the most desirable compound, must be determined by experiment. And the court observed: 'Where a patent is claimed for such a discovery it should state the component parts of the new manufacture claimed with clearness and precision, and not leave a person attempting to use the discovery to find it out "by experiment."' See, also, Béné v. Jeantet, 129 U. S. 683 [9 Sup. Ct. 428, 32 L. Ed. 803]; Howard v. Detroit Stove Works, 150 U. S. 164, 167 [14 Sup. Ct. 68, 37 L. Ed. 1039]; Schneider v. Lovell [C. C.] 10 Fed. 666; Welling v. Crane [C. C.] 14 Fed. 571."

It is noteworthy, also, that the specifications of the patent speak of— "The discovery by me that gelatinized nitro-cellulose still containing the solvent employed for its gelatinization, on being exposed to certain liquids or to vapors thereof undergoes a kind of coagulation and a division into small lumps, which latter is promoted by stirring."

This certainly is a categorical statement, that granulation to a measurable extent will be produced by the simple exposure of the gelatinized mass to a liquid or vapor, without stirring. Complainants' expert, Prof. Munroe, however, testifies as follows:

"XQ. 76. Can the gelatinous mass produce by kneading the nitro-cellulose and a solvent of it, as described in the 'Von Freeden' patent, be granulated by exposing it to a liquid or vapor without stirring?

"A. In my opinion it cannot be."

The policy as well as the express language of the patent law demands greater accuracy of statement than this.

There are other defects in the statements contained in the patent in suit, which have been discussed at length during the hearing and in the briefs, which, though having a serious bearing upon the validity of the first claim of the patent in suit, need not be further considered here, in the view taken of the difference between the process of the patent in suit and that practiced by the defendant.

In addition to what has been said as to the "Du Pont" process, it should not pass without notice, that the product of that process—that is, the gunpowders manufactured thereby and sold on the market—differ in structure and quality from those of the "Von Freeden" process. The latter process forms the grains of the powder from a gelatinized plastic mass of nitro-cellulose, in which the nitro-cellulose has been "completely dissolved." The result of this is a complete disappearance of the fiber of the gun cotton from the gelatinized mass and the grains formed therefrom. These grains are distinguished, when examined under the microscope, by a certain hard, glistening surface and an absence of any appearance of porousness. The grains of the "Du Pont" powders, on the other hand, exhibit, under the microscope, pores or channels through the grains, and minute portions of the fiber of the nitro-cellulose, which have been undissolved in the formation of the grain by the gelatinizing agent. They do not present the glistening metallic or flint-like surface of the "Von Freeden" process. They constitute what are known in the trade as a "bulk powder," as distinguished from a "dense powder," such as is produced by the "Von Freeden" process. The gravimetric density of the latter is more than 50 per cent. greater than that of the "Du Pont" process. According to Mr. Francis I. Du Pont, dense powders are used where it is desired to develop greater pressure in a gun, and to develop it more slowly; also where it is desired to use less bulk of powder. Bulk powders are used where it is desired to fill the chamber of the gun to the same extent, or about the same extent, to which it is filled by black powder. The results aimed at by the two processes are different. The aim of the "Von Freeden" process was to make the hard dense grain that would not be affected by moisture. This was accomplished by the thorough gelatinization of the nitro-cellulose, by which the same should be "completely dissolved." In the "Du Pont" process, there is not this thorough gelatinization of the fiber, and no complete solution thereof, in consequence of which, many open pores and channels are present in the grain. It is, therefore, not so resistant to moisture, but possesses other qualities which made its production desirable.

This difference in the character of the products of the "Von Freeden" and the "Du Pont" processes, serves to confirm the contention already made on other grounds, that the "Von Freeden" process should be limited to the method specified in the patent. The difference is not between a superior and an inferior product, but between different kinds of powder. When complainants wished to make a bulk powder, they employed a process different from that of the patent in suit, and on the other hand, defendant manufactured its 30-caliber rifle powder, which is a powder of high density, by an entirely different process from its process for bulk powder here in question. "Under certain conditions, it is desirable to use a bulk powder, and under certain other conditions, a dense powder is preferable."

The "Du Pont" process is substantially that described in two patents issued, the one to Francis G. Du Pont and Pierre S. Du Pont, August 22, 1892, being No. 503,583, and the other of the same date, issued to Francis G. Du Pont, being No. 503,587. These patents were grant-

·ed when the "Von Freeden" patent was recent, and though there was a long correspondence between the examiner of patents and the applicants, in regard to the patentability of the process, it is not without significance that no reference was made to that patent. The presumption that the "Du Pont" process was not invalid, by reason of anticipation, is one that must have due weight in the consideration of the ·question of infringement. That presumption has not, in my opinion, been overcome, and, for the reasons heretofore stated, the bill of complaint must be dismissed.